b

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **DERRICK FORD,** Plaintiff | **CIVIL DOCKET NO. 1:23-CV-01358** |
| **VERSUS** | **DISTRICT JUDGE DOUGHTY** |
| **MARK WOOD, ET AL.,** Defendants | **MAGISTRATE JUDGE PEREZ-MONTES** |

## REPORT AND RECOMMENDATION

Before the Court is  Defendant Dr. Clois Darien Slaughter's second Motion to Dismiss.  ECF No. 36.  Because reviewing, revising, and drafting policies, as well as training and supervising medical staff, fall within the scope of Dr. Slaughter's duties as the Medical Director for the Rapides Parish Correctional Center, and because Ford has stated viable § 1983 claims against Dr. Slaughter, the second Motion to Dismiss (ECF No. 36) should be DENIED.

## I.    Background

Plaintiff Derrick Ford ("Ford") filed a Complaint pursuant to: 42 USC § 1983; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 2131, 12132; the Rehabilitation Act, 29 U.S.C. § 794; and supplemental state law claims.  ECF Nos. 1, 8, 25.  The named Defendants are Rapides Parish Sheriff Mark Wood ("Wood") (in his official capacity), his unnamed excess insurance carrier,[1] and several of his

---

[1] For any amounts awarded beyond the amount of coverage provided by the Louisiana Sheriff's Association self-insurance fund.

employees: Rapides Parish Correctional Center ("RPCC") Chief of Corrections Mike Slocum ("Slocum") (in his individual capacity); RPCC Major Doug Hollingsworth ("Hollingsworth") (in his individual capacity); RPCC Commander Mark Saucier ("Saucier") (in his individual capacity); RPCC Security Investigator Lieutenant Josh Daniels ("Daniels") (in his individual capacity); RPSO Lieutenant Mark Thomas ("Thomas") (in his individual capacity); RPSO Sergeant Brent Anderson ("Anderson") (in his individual capacity); RPSO Deputy Tyler Bennett ("Bennett") (in his individual capacity); and RPSO Deputy Danny Prenell ("Prenell") (in his individual capacity) (collectively the "RPSO Defendants"). Ford also names as Defendants: Nortec, L.L.C., a private medical company employed to provide medical care to detainees and inmates at the RPCC; Nortec's unnamed insurer; and Dr. Lois Darien Slaughter ("Dr. Slaughter") (in his official capacity as director of medical services at RPCC). ECF No. 12. Ford seeks a jury trial, declaratory relief, and monetary damages, including punitive damages.

Ford contends that he is mentally ill. In October 2022, when he had a psychotic episode with hallucination, he was arrested and incarcerated in the Rapides Parish Correctional Center, where he was shackled for four days and denied medical care until he was found unconscious and taken to the hospital. Ford spent 30 days in the hospital. He had gangrene and necrosis in his right leg, right arm and hand, and left foot that he claims was caused by the shackles. As a result, his right arm, right leg below the knee, and part of his left foot were amputated. ECF No. 12. Ford also

had acute kidney injury, severe hyperkalemia and renal failure, and acute respiratory failure.  ECF No. 12.

Ford contends RPSO deputies beat him, shackled his wrists and ankles, and left him continuously shackled for four days without periodic monitoring.  ECF No. 12 .  Ford did not receive a medical screening upon his arrival at RPCC, nor did he receive mental or physical medical care during his four day incarceration there.  ECF No. 12.  Ford further contends another inmate poured lighter fluid on him and set him on fire, and that he was not provided medical care for his burns.[2]  ECF No. 12.  Due to his mental impairment, Ford was unable to draft and submit a grievance. ECF No. 12.

Plaintiff voluntarily dismissed his claim against Nortec, L.L.C upon learning it had been replaced by Dr. Slaughter as the RPCC healthcare provider.  ECF Nos. 4, 5.  Defendants Woods, Slocum, Hollingsworth, Saucier, and Daniels (the "RPSO Defendants") then filed a Motion to Dismiss Ford's repetitive official capacity claim and claims for punitive damages.  ECF No. 6.  In response, Ford filed a First Amended Complaint to specify that his claims against Sheriff Wood are official capacity claims, and his claims against all other RPSO Defendants are individual capacity claims.  He also identified previously anonymous RPSO Defendants.    ECF Nos. 8, 24. Defendants' Motion to Dismiss (ECF No. 6) was denied as moot.  ECF No. 35.

---

[2] So far, there is no evidence in the record before the Court that Ford was burned.  However, there is some evidence that he shouted about a fire when he was believed to be hallucinating.

3

Defendant Dr. Slaughter filed a first Motion to Dismiss for Failure to State a Claim, arguing: (1) the official capacity claims against him are repetitive of the official capacity claims against Sheriff Wood; (2) the claim for punitive damages should be dismissed; and (3) Ford's claims are all for medical malpractice claim and are premature because he has not presented them to a medical review panel. ECF No. 10. In response, Ford filed a Second Amended Complaint that deleted all medical malpractice claims. ECF No. 25. Dr. Slaughter's first Motion to Dismiss was denied. ECF No. 35.

Dr. Slaughter then filed a second Motion to Dismiss that is before the Court. ECF No. 36. Dr. Slaughter contends that Ford's remaining claims against him are also medical malpractice claims.

## II. <u>Law and Analysis</u>

### A. <u>Standards for Motion to Dismiss</u>

A court may grant a motion to dismiss for "failure to state a claim upon which relief can be granted" under Fed. R. Civ. P. 12(b)(6). "[A] complaint will survive dismissal for failure to state a claim if it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The court must view all well-pleaded

facts in the light most favorable to the plaintiff. *See Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016).

Although a court must accept all well-pleaded facts as true, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Generally, a court should not dismiss a lawsuit under Rule 12(b)(6) without giving plaintiff "at least one chance to amend." *See Hernandez v. Ikon Office Solutions, Inc.*, 306 Fed. Appx. 180, 182 (5th Cir. 2009). However, that general rule does not apply if an amendment would be futile. *See Townsend v. BAC Home Loans Servicing, L.P.*, 461 Fed. Appx. 367, 372 (5th Cir. 2011); *Jaso v. The Coca Cola Co.*, 435 Fed. Appx. 346, 351–52 (5th Cir. 2011). In this context, futility means "that the amended complaint would fail to state a claim upon which relief could be granted." *See Stripling v. Jordan Production Co., L.L.C.,* 234 F.3d 863, 873 (5th Cir. 2000).[3]

### B.  <u>Medical and prison records and statements attached to the Complaint.</u>

In the medical records attached to Ford's Complaint, Ford shows he was initially taken to the emergency room, where he was given Benadryl and Geodon. ECF No. 25-4 at 10; No. 42-2 at 11. Ford further shows that he was admitted to and

---

[3] "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Celino v. Biotronik, Inc.*, 536 F. Supp. 3d 89 (E.D. La. 2021) (citing *Cutrer v. McMillan*, 308 Fed. Appx. 819, 820 (5th Cir. 2009); *Clark v. Amoco Production Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).

discharged from Longleaf Hospital (psychiatric) on October 1, 2022.  ECF No. 25-4 at 1; No. 42-2 at 2.  The police took him to Longleaf on a PEC (physician's emergency certificate) for the services of Dr. Rodgman.  ECF No. 25-4 at 9, 11; No. 42-2 at 10.

Ford was hearing voices and believed people were trying to kill him and his family.  ECF No. 25-4 at 1; No. 42-2 at 2.  According to Ford's urine drug screen, the crisis was precipitated by his use of THC, fentanyl, amphetamines, and cocaine within the preceding 72 hours.[4]  ECF No. 25-4 at 11; No. 42-2 at 12.  When his handcuffs were removed, Ford charged at a nurse, so he was placed in 4-point restraints.  ECF No. 25-4 at 11-12; No. 42-2 at 12-13.  However, he continued to act out and tore the TV cabinet off the wall, using the pieces as weapons.  ECF No. 25-4 at 1; No. 42-2 at 2.  Ford was placed in seclusion but was very manic and attempted to assault staff, so he was given chemical restraints.  ECF No. 25-4 at 1; No. 42-2 at 2.  Ford continued to act out and be a danger to himself and others, so the police were called and he was arrested.  ECF No. 25-4 at 1; No. 42-2 at 2.  A psychiatric evaluation was not completed.  ECF No. 25-4 at 3.

Ford's intake mental status exam at Longleaf, by Dr. Rodgman, shows that Ford was disheveled, his hygiene was poor, he avoided eye contact, he appeared tense and angry, his mood was anxious and depressed, his articulation was poor, his thoughts were distracted, he was having auditory hallucinations, and he was

---

[4] Ford had previously been diagnosed with polysubstance abuse and anxiety.  ECF No. 25-4 at 11; No. 42-2 at 12.

paranoid.  ECF No. 25-11 at 86.  Dr. Rodgman's initial diagnosis was psychosis: (1) an acute psychiatric condition requiring 24-hour skilled nursing/medical oversight; (2) potential danger to self or others; (3) less intensive treatment not safe or feasible; and (4) gravely disabled with severe deterioration in functioning.  ECF No. 25-11 at 87; No. 42-2 at 17.  Dr. Rodgman further stated that Ford: was a low suicide risk; needed his vital signs checked daily; and needed to be weighed on admission and weekly.[5]  ECF No. 25-11 at 88.

Deputy Thomas's report shows that, on October 1, 2022, Ford was arrested on a warrant out of Jefferson Parish.  ECF No. 25-11 at 58; No. 25-13 at 4.   Deputy Thomas wrote that, at 7:00 p.m., "while Ford was in the holding tank waiting to be booked on the fugitive warrant for Jefferson Parish, offender Ford was sitting holding desk one and [Thomas] noticed that offender Ford was watching the elevator doors on the front door."  ECF No. 25-11 at 58; No. 25-13 at 4.  Deputy Thomas asked Deputy Alexander to put a set of leg restraints on Ford during the booking.  ECF No. 25-11 at 58; No. 25-13 at 4.  When Ford refused to answer any questions during booking, he was placed in the holding tank.  ECF No. 25-11 at 58; No. 25-13 at 4.

Ford tried to run away from the deputies when he was being placed in the holding tank, so he was placed on "the bench" in restraints for a cooling off period.  ECF No. 25-11 at 58; No. 25-13 at 4.  Ford yelled, screamed, twisted, and turned the

---

[5] On admission, Ford was 6' tall and weighed 157 pounds.  ECF No. 25-11 at 102.

entire time.  ECF No. 25-11 at 58; No. 25-13 at 4.  Ford would not calm down, so at 1:45 a.m., on October 2, 2022, he was placed in a bed.  ECF No. 25-11 at 58; No. 25-13 at 4.  Sgt. Anderson advised him that he was going to take the restraints off him, but when he started to do so, Ford grabbed him and started pulling away.  ECF No. 25-11 at 58; No. 25-13 at 4.  Deputy Bennett tried to help him and was bitten by Ford.  ECF No. 25-11 at 58; No. 25-13 at 4.  Ford then "slung" his restraint chains, hitting Lt. Thomas in the face.  ECF No. 25-11 at 58; No. 25-13 at 4.  Lt. Thomas then stunned Ford with a taser.  ECF No. 25-11 at 58; No. 25-13 at 4.  Ford then complied with the order to get on the bench again.  ECF No. 25-11 at 58; No. 25-13 at 4.  But when the restraints were put on Ford again, he became violent again by resisting the officer, and Lt. Thomas stunned him with the taser again.  ECF No. 25-11 at 58; No. 25-13 at 4.  Lt. Thomas explained that Ford was put in restraints due to his violet behavior.  ECF No. 25-11 at 58; No. 25-13 at 4.

According to a report by Deputy Tyler Glen Bennett, on October 2, 2022 at 1:35 a.m., Ford bit Deputy Bennett on the arm when he was helping Sgt Anderson, Lt. Thomas, and Deputy Prenell remove Ford's restraints to escort him to the bathroom.  ECF No. 25-11 at 23, 50; No. 25-13 at 2.  Ford was subdued.  ECF No. 25-11 at 23; No. 25-13 at 2.  Ford then raised his arms and hit Lt. Thomas in the face with his chains.  ECF No. 25-11 at 23, 50; No. 25-13 at 2.  Ford was again subdued with force, and Lt. Thomas tasered him.  ECF No. 25-11 at 23, 50; No. 25-13 at 2.  Ford was then "handcuffed back to the bench."  ECF No. 25-11 at 23, 50.  Deputy Bennett wrote that

Ford "did not request nor did he appear to need any medical attention at that time." ECF No. 25-11 at 23, 50. Ford was charged with battery on an officer. ECF No. 25-11 at 22-23, 25; No. 25-13 at 2.

Deputy Prenell's report shows that, on October 2, 2022 at 1:45 a.m., he was called by Sgt. Anderson to assist Ford to the bathroom. ECF No. 25-11 at 48; No. 25-13 at 3. Deputy Prenell was instructed to put on gloves due to Ford's "previous loud, unexpected behavior." ECF No. 25-11 at 48; No. 25-13 at 3. Deputy Prenell states that Ford became hostile and violent, refusing to comply with several verbal commands. ECF No. 25-11 at 48; No. 25-13 at 3. When Deputy Prenell and Deputy Bennett grabbed Ford's hands in order to gain control, Ford bit Deputy Bennett. ECF No. 25-11 at 48; No. 25-13 at 3. Sgt. Anderson then "subdued him back to the bench." ECF No. 25-11 at 48; No. 25-13 at 3. Although Ford agreed to comply, he continued to disobey commands and "caused Lt. Thomas to be hit in the facial area with the restraint chains." ECF No. 25-11 at 48; No. 25-13 at 3. "Force was used to gain compliance and the tase in a drive stun was administered by Lt. Thomas." ECF No. 25-11 at 48; No. 25-13 at 3. Ford was then handcuffed to the bench and "did not request medical attention." ECF No. 25-11 at 48; No. 25-13 at 3.

Sgt. Anderson reported that, on October 2, 2022 at 1:35 a.m., Ford notified him that he needed to use the restroom. ECF No. 25-11 at 49; No. 25-13 at 1. "Due to [his] mental status and abrupt behavior towards Deputies," Ford was "housed on the red bench." ECF No. 25-11 at 49; No. 25-13 at 1. When they "unhooked" Ford from

the bench, he "began to raise up in an aggressive manner," so they deputies attempted to subdue him.  ECF No. 25-11 at 49; No. 25-13 at 1.  Ford bit Deputy Bennett.  ECF No. 25-11 at 49; No. 25-13.  Sgt. Anderson then "grabbed [Ford's] upper chest area in order to gain compliance to the bench."  ECF No. 25-11 at 49; No. 25-13 at 1.  Ford then stated he would comply with orders, but he raised his arms up and hit Lt. Thomas in the face with the chains.  ECF No. 25-11 at 49; No. 25-13 at 1.  Ford was then subdued to the ground and Lt. Thomas then tased him.  ECF No. 25-11 at 49; No. 25-13 at 1.  Ford was then "handcuffed back to the bench."  ECF No. 25-11 at 49; No. 25-13 at 1.  "Ford did not request nor did he appear to need any medical attention."  ECF No. 25-11 at 49; No. 25-13 at 1.

A nurse's note shows that, the next morning, Ford was on "the red bench" and had been tased, but "medical couldn't check him out because of his violent behavior and spitting.  ECF No. 25-11 at 75.

A second report by Sgt. Anderson shows that, on October 2, 2022 at 9:22 p.m., he saw Ford (still) on the bench with both eyes swollen.  ECF No. 25-11 at 51; No. 25-12.  When Sgt. Anderson asked Ford what was wrong, Ford started screaming to his mother about a fire, then put his head between his knees and began stomping his feet, yelling, and slapping the bench.  ECF No. 25-11 at 51; No. 25-12.  Sgt. Anderson reported that Ford had been doing that for about 20 hours.  ECF No. 25-11 at 51; No. 25-12.  Sgt. Anderson tried to feed Ford and give him water, but he said the deputy was trying to poison him.  ECF No. 25-11 at 51; No. 25-12.  Sgt. Anderson stated in

his report there was no medical staff on duty during the day, and the night shift "medical staff" stated she could not tell what was wrong with his eyes due to him yelling "nonstop," but thought maybe a blood vessel had popped and caused the swelling. ECF No. 25-11 at 51; No. 25-12.

On October 4, 2022, Lt. Jarrell instructed deputies to get Ford and fingerprint him before the Jefferson Parish Sheriff's Office deputies arrived to transport him to Jefferson Parish (pursuant to a warrant). ECF No. 25-11 at 52; No. 25-14 at 1. After Ford was taken to the print room, Sgt. Burleson got him some water and asked Nurse Bowie to get his vitals, to see if there was something medically wrong with him. ECF No. 25-11 at 52; No. 25-14 at 1. When Lt. Jarrell checked on them, Sgt. Burleson was trying to get Ford to drink some water, and the nurse was trying to read his blood pressure. ECF No. 25-11 at 52; No. 25-14 at 1. Lt. Jarrell left for a moment and returned to find they had administered chest compressions to Ford and called an ambulance. ECF No. 25-11 at 52; No. 25-14 at 1. Ford left in an ambulance. ECF No. 25-11 at 52; No. 25-14 at 1.

Corporal Evans's report shows that, on October 4, 2022 at 1:10 pm, he and three other deputies when to Ford's cell to take him to be fingerprinted. ECF No. 25-11 at 53; No. 25-14 at 2. Ford was naked and his jumpsuit was covered in an unknown liquid. ECF No. 25-11 at 53; No. 25-14 at 2. They helped Ford dress in a clean jumpsuit and took him to the print room. ECF No. 25-11 at 53; No. 25-14 at 2. They had difficulty getting Ford to stand up for a mugshot photo. ECF No. 25-11 at 53; No.

11

25-14 at 2.  Then they put Ford on the bench in the print room, and Sgt. Burleson spoke to him and got him some water.  ECF No. 25-11 at 53; No. 25-14 at 2.  Nurse Bowie evaluated Ford and said his blood pressure was too low and he needed to go to the hospital.  ECF No. 25-11 at 53; No. 25-14 at 2.  The deputies helped the nurse move Ford to the floor, but his vital signs continued to decline.  ECF No. 25-11 at 53; No. 25-14 at 2.  The nurse started giving Ford chest compressions, then Corporal Evans took over.  ECF No. 25-11 at 53; No. 25-14 at 2.  When Ford's pulse returned, the nurse started Ford on oxygen.  ECF No. 25-11 at 53; No. 25-14 at 2.  Ford left in an ambulance.  ECF No. 25-11 at 53; No. 25-14 at 2.

Sgt. Burleson's report shows that, on October 1, 2022 at 1:00 p.m., he retrieved a clean jumpsuit for Ford to wear to go to the print room.  ECF No. 25-11 at 54; No. 25-14 at 3.  He saw Ford struggling to put on the jumpsuit, at one point falling to the ground.  ECF No. 25-11 at 54; No. 25-14 at 3.  After the officers sat Ford on a bench in the print room, Burleson noted that Ford "appeared weak and slightly out of it." ECF No. 25-11 at 54; No. 25-14 at 3.  Sgt. Burleson got Ford some water and asked Nurse Bowie to check on him.  ECF No. 25-11 at 54; No. 25-14 at 3.  About the same time, Lt. Jarrell also asked Nurse Bowie to get Ford's vitals and see if he was okay. ECF No. 25-11 at 54; No. 25-14 at 3.

Sgt. Burleson and Nurse Bowie were slowly able to get Ford to take a few sips of water, but his head kept dropping forward and he seemed to be losing consciousness.  ECF No. 25-11 at 54; No. 25-14 at 3.  Nurse Bowie began working on

12

Ford and told Sgt. Burleson to call an ambulance. ECF No. 25-11 at 54; No. 25-14 at 3. Ford was given chest compressions, then oxygen. ECF No. 25-11 at 54; No. 25-14 at 3. He left in an ambulance. ECF No. 25-11 at 54; No. 25-14 at 3.

Deputy Cammack reported that, on October 4, 2022, Ford had to be helped with getting dressed, then he was escorted from his cell to the print room. ECF No. 25-11 at 55; No. 25-14 at 4. When Ford became unresponsive to verbal commands, "medical was called" and "EMT Bowie" arrived. ECF No. 25-11 at 55; No. 25-14 at 4. Ford was given chest compressions and oxygen. ECF No. 25-11 at 55; No. 25-14 at 4. He left in an ambulance. ECF No. 25-11 at 55; No. 25-14 at 4.

Deputy Treadway stated in his report that, on October 4, 2022 at 1:00 p.m., he went to get Ford out of his cell to go to the print room. ECF No. 25-11 at 56; No. 25-14 at 5. Ford was laying on the floor and refused multiple commands to stand up and exit the cell. ECF No. 25-11 at 56; No. 25-14 at 5. Deputy Treadway took Ford's hands and pulled him out of the cell. ECF No. 25-11 at 56; No. 25-14 at 5. Deputy Treadway and Deputy Johnson pulled Ford upright, but Ford was unable to stand up and fell over and hit his head on the wall. ECF No. 25-11 at 56; No. 25-14 at 5. Ford continued to not respond to "multiple commands" to stand up, so the deputies helped him dress, stand up, and walk. ECF No. 25-11 at 56; No. 25-14 at 5. Deputy Treadway noted that Ford could not function mentally or physically. ECF No. 25-11 at 56; No. 25-14 at 5.

13

Deputy Johnson's report shows that, on October 4, 2022 at 1 p.m., he found Ford in his cell covered in an unknown substance. The floor was also wet. ECF No. 25-11 at 57; No. 25-14 at 6. He helped Ford exit the cell. ECF No. 25-11 at 57; No. 25-14 at 6. When Ford reached a table in the dorm, he laid on it. ECF No. 25-11 at 57; No. 25-14 at 6. Ford was given a clean jumpsuit, so he stepped away from the table to put it on, but fell down. ECF No. 25-11 at 57. The deputies then dressed him, stood him up, and walked him to the print room. ECF No. 25-11 at 57; No. 25-14 at 6. At the print room, Ford did not cooperate with having his photo taken because he could not stand up. ECF No. 25-11 at 57; No. 25-14 at 6. Sgt. Burleson then got Ford some water and Nurse Bowie told him to call an ambulance. ECF No. 25-11 at 57; No. 25-14 at 6. Ford was given chest compressions and oxygen, then he left in an ambulance. ECF No. 25-11 at 57; No. 25-14 at 6.

A record from RPCC dated October 4, 2022 shows that a nurse saw Ford on a bench in the print room, requiring assistance to sit on the bench. ECF No. 25-6 at 2. The nurse got Sgt. Burleson to offer Ford water, but Ford was weak and unable to swallow more than a few sips. ECF No. 25-6 at 2. The nurse had to hold up Ford's head. Ford did not respond to an ammonia capsule. ECF No. 25-6 at 2. When the nurse could not find Ford's pulse, she laid him on the floor and started chest compressions. Ford gasped after about 20 compressions and he again had a pulse. ECF No. 25-6 at 2. His core body temperature was 88 degrees. ECF No. 25-6 at 2. An ambulance arrived after that.    ECF No. 25-6 at 2.

14

According to a report by the ambulance service, on December 4, 2022, an ambulance was called to the RPCC.  The ambulance service reported that Ford was found lying supine on the floor inside a room, unresponsive.  ECF No. 25-4 at 3.  A nurse reported to the EMTs that Ford was "walking to the infirmary" to be evaluated by her prior to being released from the jail, when he "suddenly collapsed."  ECF No 25-5 at 3.  Ford's skin was cold, his pupils were dilated, his skin was very dry, he appeared to be dehydrated, and he was unresponsive to painful stimuli.  ECF No. 25-5 at 3.  Ford also had wounds around his hands.  ECF No. 25-5 at 3.  Ford was transported, unconscious and unresponsive, with shackled feet, diminished lung sounds and cold, dry skin, to Rapides Regional Medical Center by ambulance.  ECF No. 25-5 at 3-4.  Upon arrival at the hospital, Ford began to respond to stimuli, look around, and move his arms.  ECF No. 25-5 at 4.

Ford's toxicology screen on December 4, 2022 was positive for amphetamines, cocaine, and marijuana.  ECF No. 25-7 at 7-8.  He was in acute respiratory failure; toxic metabolic encephalopathy was suspected; he had acute renal failure, which was treated with dialysis; he was in shock (sepsis v. severe metabolic acidosis v. IVVD); and he had hyperkalemia and a UTI.  ECF No. 25-7 at 12.  He was diagnosed with

rhabdomyolysis (with resultant acute kidney injury),[6] AKl, metabolic acidemia,[7] and toxic delirium.  An emergency hemodialysis catheter was inserted.  ECF No. 25-8 at 13.  An EEG was abnormal, which correlated to diffuse brain dysfunction.  ECF NO. 25-7 at 17.  Ford's skin was dry and he had bruising around his wrists and ankles. ECF No. 25-7 at 5.

The RPSO bonded Ford out on October 6, 2022, while he was still in the hospital.  ECF No. 25-11 at 46.

On October 8, 2022, a femoral arterial line was placed for hemodynamic monitoring of Ford's septic shock and hypotension.[8]  ECF No. 25-8 at 11.

On October 9, 2022, x-rays of Ford's ankle showed right side soft tissue swelling.  ECV No. 25-7 at 22; No. 25-8 at 1-9.

Ford's right hand and arm, and right leg below the knee, were amputated due to gangrene on October 30, 2022.  ECF No. 25-2.

---

[6] Rhabdomyolysis is the breakdown of muscle tissue that leads to the release of muscle fiber contents into the blood. These substances are harmful to the kidney and often cause kidney damage.  *See* MEDLINEplus Health Information, Medical Encyclopedia: Rhabdomyolysis*, available at* https://medlineplus.gov (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[7] Incompletely processed proteins and fats can build up in the body and cause the blood and tissues to become too acidic.  *See* MEDLINEplus Health Information, Medical Encyclopedia: Metabolic acidemia*, available at* https://medlineplus.gov (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[8] Septic shock is a serious condition that occurs when a body-wide infection leads to dangerously low blood pressure.  Any type of bacteria can cause septic shock.  *See* MEDLINEplus Health Information, Medical Encyclopedia: Septic shock*, available at* https://medlineplus.gov (a service of the U.S. National Library of Medicine and the National Institutes of Health).

C.    **Dr. Slaughter's Second Motion to Dismiss should be denied.**

Dr. Slaughter argues that Ford's claims against him are medical malpractice claims.[9]  Pursuant to § 1983, Ford contends that Dr. Slaughter failed to adequately hire, provide, train, and supervise the medical staff at RPCC.  Ford further contends that Dr. Slaughter was deliberately indifferent to the medical needs of all RPCC inmates when he removed the drug dispensary from RPCC in order to reduce costs. Ford contends Dr. Slaughter was also responsible for the maintenance of inmate medical records, but no medical records were filled out on Ford for the duration of his stay at RPCC.[10]  Finally, Ford contends Dr. Slaughter failed to instruct the medical staff, deputies, guards, and officers on the dangers of using restraints on a 24 hour per day basis to shackle mentally ill inmates.  Ford contends the restraints caused his loss of circulation and skin lacerations.

1.    **Dr. Slaughter's contractual duties included reviewing, devising, and implementing appropriate policies for maintaining appropriate standards of healthcare and record-keeping.**

Dr. Slaughter contends he was not responsible for drafting, implementing, or enforcing policies in the medical department, and therefore those claims should be

---

[9] As previously established (ECF No. 31), Dr. Slaughter is an independent contractor employed by the Rapides Parish Sheriff to serve as the medical director of the Rapides Parish Correctional Center facilities.  Ford has sued Dr. Slaughter in his "official capacity" as the Director of Medical Services at RPCC.  ECF No. 25 at 14-17.

[10] Ford admits that Dr. Slaughter did not treat Ford while he was in RPCC, and further asserts he did not receive medical care from any of the RPCC medical staff.

dismissed. Dr. Slaughter argues that he does not have the duty or the authority under his contract with the RPSO to draft, implement, or enforce policies for healthcare in the RPCC. However, his contract indicates otherwise:

> WHEREAS, RPSO and the Sheriff wish to engage Physician for professional services as medical director for RPSO Detention Centers ("DC")( 1, 2 and 3 located in Rapides Parish and work release participants. . . .
>
> WHEREAS, RPSO desires to engage Physician to **provide medical director services, including appropriate supervision of all medical personnel and others and to provide physician services for RPSO inmates requiring medical services**; . . .
>
> 3. Responsibilities of Physician
>
> 3.1 Physician is retained to provide medical director services as a physician for the RPSO (the "Services"). **Physician will advise and recommend to the Sheriff best practices for medical and related care and shall serve as medical director** for RPSO and the Sheriff's inmates for at [sic] RPSO Detention Centers ("DC") 1, 2 and 3 located in Rapides Parish, . . . .
>
> 3.2 Physician shall be **responsible for overall supervision of medical and healthcare services to RPSO's inmates** and work release participants and **such medical care shall be in the sole discretion of the Physician**.
>
> 3.3 Records and Reports. As part of the Services, **Physician shall also maintain such records** and furnish such reports of Services as may be requested by RPSO. Physician agrees to comply with any request for records or reports deemed necessary by RPSO or as may be required by the Sheriff of in the opinion of the sheriff by the Louisiana Department of Public Safety and Corrections for inmate or offender care. Physician shall submit when requested monthly reports of Services provided by Physician pursuant to this Agreement. Physician shall provide such other written reports as the Sheriff may in his sole opinion require.

        \*        \*        \*

8.      General Provisions

8.1     Compliance with Policies.  **Physician shall evaluate, consult and advise RPSO regarding all medical standards, policies, procedures and protocols**.  Further **Physician agrees to comply with** RPSO's personnel and inmate management plan, and **all service standards, clinical protocols, policies and procedures developed and reviewed by Physician and implemented by the RPSO**, as the same may be modified from time to time.

8.11  Medical Records

8.11.1  **Physician shall**, in accordance with RPSO policies, **cause to be promptly prepared records for all examinations, procedures and other services performed under this Agreement.  Physician shall maintain an accurate and complete file within RPSO of all such reports and supporting documents**.  The records so maintained shall be sufficient to enable RPSO to advise and report to the Louisiana Department of Public Safety or any state or federal agency or authority to obtain payment or compensation for the services rendered, **to facilitate the delivery of quality care, and to comply with the requirements of all licensing and accrediting agencies**.  Physician's duties shall include responsibility for preparing and attending to, in connection with such services, all reports, claims, and correspondence necessary in appropriate circumstances.  **All medical records shall be completed consistent with accepted standards of medical practice with in fifteen (15) days of the patient encounter**.

[Emphasis added.]

As the health care director and physician for RPCC, Dr. Slaughter was employed to: (1) review, revise, and/or devise policies related to appropriate inmate healthcare and record-keeping; (2) follow those policies; (3) supervise the medical staff; and (4) provide appropriate medical care to inmates himself.  Therefore, Dr.

Slaughter has potential liability for Ford's injuries that were caused by healthcare deficiencies at RPCC.

> ### 2. Ford's claims against Dr. Slaughter are not for medical malpractice.

Dr. Slaughter continues to argue that all of Ford's claims against him fall under the Louisiana Medical Malpractice Act ("LMMA"). Ford's medical malpractice claims have already been dismissed. Ford continues to assert claims under § 1983, the ADA, and the Rehabilitation Act.[11]

The LMMA, La. R.S. 40:12231.1, defines "malpractice":

(13) "Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the training or

---

[11] "Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' 42 U.S.C. § 12132. The Rehabilitation Act protects any 'otherwise qualified individual with a disability in the United States' from being 'excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any program or activity receiving Federal financial assistance,' including any instrumentality of a local government. 29 U.S.C. § 794. 'The remedies, procedures, and rights available under the Rehabilitation Act parallel those available under the ADA.'" *Acosta v. Williamson County, Texas*, 2024 WL 3833303, at *7 (5th Cir. 2024) (citing *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020)). "Thus, th[e Fifth Circuit] 'equate[s] liability standards under [the Rehabilitation Act] and the ADA.'" *Acosta*, 2024 WL 3833303, at *7 (citing *D.A. ex rel. Latasha A. v. Houston Independent School District*, 629 F.3d 450, 453 (5th Cir. 2010)).

Both the ADA and the Rehabilitation Act may provide a cause of action for a prisoner. *See Ball v. LeBlanc*, 792 F.3d 584, 596 (5th Cir. 2015); *see also Acosta*, 2024 WL 3833303, at * 7. Dr. Slaughter has not contested Ford's ADA and Rehabilitation Act claims.

supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient.

Thus, a negligence standard applies to an unintentional tort asserted under the LMMA. *See Francois v. Parish,* 2015 WL 711815, at *8 (E.D. La. 2015).

Section 1983 provides relief from constitutional torts, which are intentional or committed with "deliberate indifference".[12]  *See Thomas v. James,* 809 F. Supp. 448, 449 (W.D. La. 1993).  Section 1983 claims are not "unintentional" torts and do not fall within the scope of the LMMA.

### 3.    Plaintiff adequately alleges causation.

Dr. Slaughter also contends Ford's complaint should be dismissed because he "cannot establish causation."  Dr. Slaughter asserts the Rapides Regional Hospital records do not indicate that Ford contracted gangrene at RPCC.

Ford contends the restraints caused loss of circulation and lacerations, which resulted in gangrene and amputations.  The restraints remained on Ford for four days, and his condition was not checked daily by medical staff at RPCC because, Ford contends and records (or lack thereof) show, medical staff is not present at RPCC every day and Ford was not given an intake medical assessment at RPCC.

---

[12] "A prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  The Supreme Court defines "deliberate indifference" as "subjective recklessness" or a "conscious disregard of a substantial risk of serious harm."  *See Farmer v. Brennan*, 511 U.S. 825, 839 (1994).  Deliberate indifference does not include a complaint that a physician has been negligent in diagnosing or treating a medical condition.  *See Estelle*, 429 U.S. at 106.

21

At this time, the Court has before it only the few medical records that are attached to Ford's Complaint. Very few of those are from Rapides Regional Medical Center. Without complete medical records, the Court cannot ascertain Ford's condition when he arrived at the hospital, when his gangrene began, or why he had gangrene. Those issues may be resolved on a motion for summary judgment.

Viewing Ford's well-pleaded allegations in the light most favorable to Ford, he has alleged § 1983 claims against Dr. Slaughter for inadequate staffing, training, and supervision of the RPCC medical department, and deficient procedures for medical care of mentally ill and/or shackled inmates at RPCC, that caused Ford's injuries. *Compare Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 745-47 (M.D. La. 2016) (prison officials' failure to accommodate a detainee's mental illness, instead of shackling and handcuffing the detainee, stated a claim under § 1983 and the ADA).

## III.  Conclusion

Based on the foregoing, IT IS RECOMMENDED that Dr. Slaughter's second Motion to Dismiss (ECF No. 36) be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy

of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __12th__ day of November 2024.

Joseph H.L. Perez-Montes
United States Magistrate Judge

23